## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JAMES DAVID COX,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 5:11-CV-2559-SLB** |
| | ) | |
| **DAY & ZIMMERMANN NPS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This case is before the court on Motion for Summary Judgment filed by defendant Day & Zimmerman NPS [DZ].  (Doc. 53.)[1]  Plaintiff James David Cox alleges that defendant, his former employer, discriminated against him because of his age in violation of federal law.  Upon consideration of the Motion, the supporting and opposing memoranda, arguments of counsel, and the relevant law, the court finds that defendant's Motion for Summary Judgment, (doc. 53), is due to be denied.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

---

[1]Reference to a document number, ("Doc. ___"), refers to the number assigned to each document as it is filed in the court's record.

56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact and that it is therefore entitled to judgment as a matter of law.  *See Celotex*, 477 U.S. at 323*; Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has met its burden, Rule 56(e) requires that the nonmoving party go beyond the pleadings and show that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 324-25.  "There is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor."  *Waddell*, 276 F.3d at 1279; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  Determining credibility, weighing evidence, and drawing legitimate inferences from the facts are all functions of the jury, *see id.* at 255; therefore, the court must accept as true all evidence favoring the nonmoving party and draw all justifiable inferences from the evidence in that party's favor.  Nevertheless, the nonmoving party need not be given the benefit of every inference but only of every *reasonable* inference.  *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

2

## II. <u>STATEMENT OF FACTS</u>

**A.    GENERAL BACKGROUND**

Browns Ferry Nuclear Plant is the largest boiling-water reactor nuclear power station in the United States.  (Melvin Depo. [docs. 55-2 and doc. 55-3] at 61.)  Tennessee Valley Authority [TVA] operates the station and supplements its labor force by retaining contractors, such as defendant DZ, to perform portions of the plant's maintenance work. (Melvin Depo. at 65.)   DZ is a power maintenance contractor for nuclear, fossil, and hydroelectric power plants in the United States, including Browns Ferry.  (Doc. 36 ¶ 6.) Plaintiff James David Cox began working with TVA in 1969 as a Laborer.  (Cox Depo. [doc. 55-7] at 10-11.)  He remained employed with TVA for approximately 35 years, eventually attaining the position of Mechanical Production Manager in Maintenance, until he retired in December 2004.  (*Id*. at 18-21.)  After retiring, Cox has continued to work periodically at Browns Ferry under various TVA subcontractors. (Doc. 23 ¶ 11.)

The Project Maintenance and Modifications Agreement [PMMA] between TVA and its contractors, including DZ, covers and describes general personnel matters.  (Doc. 55-5; Collins Depo. II [doc. 55-6] at 41.)  Under the PMMA, DZ may hire employees at Browns Ferry as either "augmented" or "task-managed" workers.  (Doc. 55-5 at 3.)  "Augmented" workers, although technically DZ's employees, are supervised by and receive their work assignments from TVA managers or supervisors; "task-managed" workers are supervised by

and receive their work assignments from DZ contractors or supervisors.  (*Id*.; Melvin Depo. at 77-79; Collins Depo. II at 42.)

## B.   FIRST PERIOD OF EMPLOYMENT WITH DZ – CHECK VALVE INSPECTIONS

DZ hired Cox as a Task Manager to supervise modifications for the Unit 3 refueling outage in February 2010.  (Cox Depo. at 39.)  Although classified as a Task Manager, Cox's assignment was to perform "check valve inspections."  (Doc. 60-22 ¶ 2.)  He supervised a team of craftsmen assigned to inspect valves for fitness and durability and to ensure that those inspections were accurately documented.  (*Id.* ¶ 4.)  He directed some of the craftsmen's work, but they did not report to him.  (Cox Depo. at 39.)

At some point, Ron Rogers, TVA's Projects Maintenance and Modifications Manager, instructed Cox to review all work orders relating to the installation of new valves to ensure that they complied with TVA's valve packing procedure.  (Doc. 60-22 ¶ 5.)  One such work order, WO 02-003234-000, involved the installation of new replacement valves in the Unit 3 reactor's heat vent.  (*Id*.)  Cox reviewed this work order and noticed that the work package did not include valve packing instructions.  (*Id.* ¶ 6.)  Cox added TVA procedure MCI-0-000-PCK001 ("PCK001") to the work package, which describes "the generic maintenance instructions for valve packing."  (*Id*.; doc. 60-34 at 3; *see generally* doc. 60-29.)

Section 7.7 of PCK001 describes the procedure for "packing adjustment."  (Doc. 60-29 at 13-15.)  Section 7.7 directs the person responsible for replacing a valve to "cycle" the valve, a process that consolidates the valve's packing material prior to installation.  (*Id.* at

4

13-14; doc. 60-22 ¶¶ 7, 11.)  Often this process requires adding packing or re-packing a valve.  (Doc. 60-22 ¶ 7.)  However, the work package did not include a valve packing data sheet for the Unit 3 replacement valves.  (*Id*. ¶ 8; Cox Depo. at 102.)  A data sheet contains the valve packing specifications, which includes a valve's torque value, packing materials, and a packing configuration.  (Doc. 60-22 ¶¶ 7-8.)  This information is necessary before packing or re-packing a valve properly.  (*Id*. ¶ 8.)

Cox consulted TVA's Maintenance Valve Packing Specialist to obtain the valve packing specifications for the Unit 3 replacement valves.  (*Id*. ¶ 8; Cox Depo. at 102-03.)  The valve packing specifications were not in the Browns Ferry valve packing database, and TVA contacted Flowserve, the manufacturer of the valves.  (*Id*.)  However, Flowserve did not provide the specifications.  (*Id*.)  Cox then consulted with a TVA Projects Maintenance and Modifications Manager, the DZ Site Manager, and the DZ Site Superintendent; "they all agreed to only verify that the valves had packing and [that] the packing be inspected in accordance with the valve packing procedure."  (Doc. 60-22 at ¶ 8.)  Cox had the supervisor inspect the valve to see if it had packing or needed consolidating.  (Cox Depo. at 104.)

Cox subsequently marked Section 7.7[2] as "N/A" or "not applicable," as directed by Section 7.7[1] of PCK001, which requires that Section 7.7[2] of the packing adjustment procedure be omitted if the torque value is unknown.  (Doc. 60-22 ¶ 9; doc. 60-29 at 5.)  Cox further marked Sections 7.7[3.1]-[3.5] and 7.7[5]-[6], and their corresponding "Quality Control hold points," as "N/A" or "not applicable" because, according to Cox, "each of these

sections required knowledge of the torque values for the valve in order to complete these tasks and that information was unavailable."  (Doc. 60-22 ¶ 9; doc. 60-29 at 6; Cox Depo. at 103.)  Cox testified that "if you don't perform a step, it's a practice to [mark] N/A."  (Cox Depo. at 101.)  Sections 7.7[3.1]-[3.5] contained the procedure for cycling the valves and consolidating the valve packing material therein.  (Doc. 60-29 at 5-6.)  Sections 7.7[3.4] and [3.5] direct the packer to torque and repeat, explicitly directing the person filling out the form to mark "N/A" otherwise.  (*Id*. at 6.)  Section 7.7[5] directs that person to "[r]ecord final torque applied.  Otherwise, N/A."  (*Id*. at 7.)  Cox did not install or inspect the Unit 3 replacement valves.  (Cox Depo. at 78-80; doc. 60-22 ¶ 12.)  The supervisor responsible for the project was Charles Campbell.  (Doc. 60-22 ¶ 12; doc. 60-26 at 5.)

This period of Cox's employment lasted for the rest of the refueling outage and ended in May 2010.  (Cox Depo. at 39.)

## C.  SECOND PERIOD OF EMPLOYMENT WITH DZ – FIRE PROTECTION PROJECT

The following month, on June 10, 2010, DZ rehired Cox to supervise roofing contractors at Browns Ferry.  (*Id*. at 40; doc. 23 ¶ 15.)  In July 2010, Cox was reassigned to supervise the 95-002 Fire Protection Project inside the plant's protected area.  (Cox Depo. at 40-41; doc. 23 ¶ 15.)  This project involved replacing and refurbishing pipes and valves associated with the plant's fire protection system.  (Cox Depo. at 40-41, 56.)

On July 26, 2010, DZ hired John Melvin as Site Manager at Brown Ferry.  (Melvin Depo. 59, 64.)  Melvin was thirty-eight years old.  (*Id*. at 12.)  As Site Manager, Melvin

supervised all DZ projects and employees at Browns Ferry, and he had authority to discipline DZ employees for work rule violations.  (*Id*. at 64, 87-88, 115.)  Melvin used his "management judgment" to apply the DZ "job site work rules" in determining the severity of the discipline to be imposed.  (*Id*. at 115-16, 205-06.)  He testified that he did not have, and did not exercise, discretion to stray from the job site work rules in disciplining employees.  (*Id*. at 125-26.)

Shortly after Melvin arrived at Browns Ferry, Cox introduced himself to Melvin and informed Melvin that he had retired from TVA in 2004, that he had been performing contracting work at Browns Ferry since his retirement, and that he was willing to help Melvin in any way possible.  (Cox Depo. at 56-57.)  Melvin told plaintiff that "the *old* station personnel . . . were the problem" for him and DZ.  (*Id*. at 57 [emphasis added].)  Melvin later told DZ supervisor Jack Watson ("Watson"), who was sixty-five at the time, that he "found that *old* station hands did not conform to the company's expectations."  (Watson Depo. [doc. 60-3] at 23-24 [emphasis added].)  Watson testified that he asked Melvin what expected qualities he was missing.  (*Id*.)  Melvin simply turned around and walked away.  (*Id*.)  Watson also testified that on another occasion Melvin asked him, "Watson, you got a problem working for me?"  (*Id*. at 24.)  Watson replied, "No, why?;" to which Melvin said, "Your age."  (*Id*.)  Watson testified he asked Melvin, ". . . "I'm not but sixty-five, have you got a problem with me working for you?"  (*Id*.)  Melvin did not answer, but he "turned red as [a] Coke can" and walked away.  (*Id*.)

7

On August 12, 2010, a forced outage[2] occurred on the Unit 3 reactor at Browns Ferry due to a significant increase in unidentified drywell leakage.  (Doc. 55-16 at 1.)  The forced outage lasted for three days.  (Doc. 60-22 ¶ 21.)  An inspection of the Unit 3 reactor identified the "source of the leak to be leaking packing gland on a manual reactor head vent line drain valve BFN-3-VTV-010-0502," a Unit 3 replacement valve installed through WO 02-003234-000.  (*See* doc. 60-34 at 3; doc. 60-29 at 4).  This was the project on which Cox had been responsible for ensuring the valve installation complied with TVA's valve packing procedures.  TVA launched an investigation into whether the incident constituted a "human performance event" – i.e., whether somebody had made an error in procedure – and completed a Performance Evaluation Report ("PER"), which determined that the leak was a "human performance event" and attributed fault to an unnamed DZ valve technician.  (*See* Melvin Depo. at 204; doc. 55-15.)  TVA rates PERs on an alphabetical scale:  an A-PER is the most severe and a D-PER is the least severe.  (Melvin Depo. at 208-09.)  TVA rated the PER to the failure of valve 10-502 as a B-PER.  (Doc. 55-15.)  This was the only time during Melvin's two-year tenure that any of the three power units was shut down due to work performed by DZ.  (Melvin Depo. at 217-18.)

Patrick Guevel, TVA's Modifications Manager, investigated the B-PER and completed a Quick Human Error Analysis Tool [QHEAT], which gathers facts, develops a

---

[2]  An "outage" is the term used for the shutdown of a nuclear power unit. (Doc. 60-4 at 34.)

time line of events, defines the responsible individuals, and sets forth their perceptions and actions. (Cox Depo. at 107-08; Melvin Depo. at 206, 213, 229; doc. 60-34 at 1 & 8.) Guevel interviewed Cox as part of his investigation.  (Cox Depo. at 83; doc. 60-22 ¶ 21.)   Cox explained that the work package for the Unit 3 replacement valves did not contain valve packing instructions or a valve packing data sheet and that he added PCK-001 into the work package.  (Doc. 60-22 ¶ 21.)   Guevel told Cox that he was "the only one in the chain of command who had done what they were supposed to do."  (*Id*.)

However, Guevel reached a different conclusion in the QHEAT, attributing the valve's failure to the actions taken by Cox.  (*See generally* doc. 60-34.)   According to Guevel's QHEAT –

> The investigation determined that the valve assembly was prefabricated prior to the 2006 refueling outage, but not installed. The investigation also found that the packing was not properly consolidated when the valve was installed in the March 2010 refueling outage.
>
> A valve technician added Valve Packing Procedure MCI-0-000-PCK001 into the work order package but violated procedure by inappropriately marking the packing consolidation and hold steps as N/A.

(Doc. 60-34 at 7.) Also, the QHEAT stated, "Consolidation steps MCI-0-000-PCK001 refer to the use of a specific torque value in performing the steps," and that the valve technician incorrectly assumed that the step for consolidating the valve could not be performed without knowledge of the valve's torque value.  (*Id*.)  However, the QHEAT noted that PCK001 is unclear on the requirements for "new valves/new packing material" and that, "[e]ven after the procedure was added by [the] valve technician[,] it was not followed." (*Id*. at 5.)

Although he was not named in the QHEAT and he was not a valve technician, Cox testified that he was the individual who added PCK001 to the work package investigated by Guevel and that he was the one that marked the N/As on the work order. (*See* Cox Depo. at 78-79, 103-104, 109; *see also* doc. 60-22 ¶ 21.)

On September 23, 2010, Guevel emailed Melvin the QHEAT and informed Melvin that it would result in a "Site Clock Reset." (Doc. 55-15.)  Clocks at the plant measure how much time has elapsed since the last procedure violation, injury, or human performance event. (Melvin Depo. at 206-07.)  Different crews and departments have different clocks, but when the event or violation is the most severe, the site clock—the clock for the entire site—resets to zero.  (*Id*.)  TVA management must approve of the decision to reset a clock. (*Id*. at 207-208.)   On September 24, 2010, after receiving the QHEAT, supporting documentation, and news of the Site Clock Reset, Melvin terminated Cox.  Melvin testified that he informed Cox that he was being terminated for failure to follow procedure. (Melvin Depo. at 259; *see* doc. 60-17 at 1.)  Cox was sixty-two years old at the time. (Cox Depo. at 8.)  Melvin also terminated Watson on the same day for reasons unrelated to the Unit 3 reactor valve.  (*Id*. at 67.)

Cox testified that, when he and Watson left, the major work on the Fire Protection Project had been completed, but he had expected a crew to remain on the project to tie up loose ends. (Cox Depo. at 73-74.)  Cox was told that Josh Normand became supervisor over

the Fire Protection Project, followed by Jason Hovater.[3]  (*Id.* at 73.)  At the time, Normand

was at least six years younger than Cox, (Melvin Depo. at 167), and Hovater was in his early

forties, (*see* doc. 60-36 at 4).  In an email sent to TVA on the day of Cox's termination,

Melvin stated, "Ryan Collins is working with Brooks [Patterson] to back fill the supervisory

slots left from Dave Cox and Jack Watson."  (Doc. 60-19 at 1; Melvin Depo. at 314.)

Patterson was "the task manager put in place [by TVA] to assist with the project," (Melvin

Depo. at 105), and was estimated to be in his early forties, (*id.* at 309-310).  Melvin testified

that he could not say who "solely" replaced Cox and Watson, but "it was probably Jeff

Armstrong and Ryan Collins."  (*Id.* at 313.)  Collins was thirty-five at the time.  (Collins

Depo. I [doc. 60-20] at 13.)  Jeff Armstrong was in his "mid to late fifties," and at least six

years younger than Cox.  (*See* Melvin Depo. at 181.)  Melvin also testified that there were

numerous supervisors on site and that he thought Jim Davenport took over a portion of Cox

and Watson's work.  (*Id.* at 324.)  Davenport was sixty-five at the time of Melvin's

deposition.  (*Id.*)  Melvin testified that DZ did not have a "record-keeping process of who is

assigned where."  (*Id.* at 325.)  In any case, he testified that Cox's position was not

eliminated and that someone had to fill his role.  (*Id.* at 314-15.)

---

[3]The record contains references to Hovater as "Hovator."  For purposes of this opinion, the court will use "Hovater," which appears to be the correct spelling.  (*See* doc. 60-36 at 2.)

## D.  BYRON BAKER

At the time relevant to this action, Byron Baker was an electrical supervisor between 40 and 50 years old.  (Collins Depo. II at 95.)  Baker's conduct came under scrutiny after his performance on a project allegedly resulted in a site clock reset.  (*Id*.)  The Quality Assurance Oversight [QAO] Report stated:

> A significant human performance situation occurred this report period with the 2A Battery Bank Charger where workers tasked with pulling a breaker discovered it was bolted to the bus (contrary to the work order language) and did not stop immediately. Additionally, there were related clearance boundary and clearance confirmation issues associated with the same task; this led to a discretionary site clock reset.

(Doc. 61-3 at 44.)  This incident occurred on or about December 21, 2010, while Melvin was Site Manager.  (*See* doc. 60-33 at 19; Melvin Depo. at 59.)  "It was stated in the QHEAT that the Primary Authorized Employee's understanding of his role in verifying the adequacy of the clearance did not meet expectations for safe job procedures (SR 300163)."  (*Id*. at 45.)  Baker was the only employee Collins identified as having been involved in this event. (Collins Depo. II at 95.)   The PER[4] prepared by TVA stated:

---

[4]Testimony does not explicitly link this PER to the event described in the QAO Report.  However, a number of clues make it reasonable to conclude that they address and describe the same event.  When Collins was referring in his deposition to the document labeled DZ-45064, (*see* doc. 61-3 at 44), he stated that "the Alpha Battery Bank Charger work was being performed by one of [his] electrical supervisors . . . Byron Baker," (Collins Depo. II at 94-95).  The QAO Report credits the maintenance workers for "perform[ing] voltage checks and discover[ing] the presence of 480 volts," (doc. 61-3 at 45), and PER 300866 states that "the craft observed voltage [480 V] on the breaker [2-BKR-248-0002AB] when performing live-dead-live checks."  PER 300866 describes an event that occurred on December 21, 2010.  (Doc. 60-33 at 1.)  A draft version of the Report suggests that the

> While working under clearance . . . the craft observed voltage on the breaker when performing live-dead-live checks.  . . .  The work was stopped and placed in a safe condition.  The clearance was revised to adequately remove all power from the breaker being worked. . . . The investigation into the event revealed the isolation boundary for the work being performed was not adequate.  The clearance was intentionally written so as to not tag the alternate power supply . . . .  A poorly written clearance request led to the Operations Responsible Employee [Baker][5] making an assumption on the work boundaries.  The ensuing clearance would have been adequate for the assumed work but did not adequately cover the actual work scope.  . . .  The Responsible Employee (RE) [Baker] did not follow the procedural guidance in NPG-SPP-10.2 when the RE accepted the poor documentation in the clearance request. . . .  [Contributing cause number two:]  Clearance writer [apparently, someone different than the RE] did not "Stop When Unsure."  The clearance writer/reviewer did not fully understand the scope of the work and did not stop to gain a clear understanding; an assumption was made based on past experiences instead of contacting the Maintenance Organization/Planning to clarify what an acceptable clearance boundary would be.

(Doc. 60-33 at 20.)  Under the "Extent of Condition/Cause," the Report stated, "Any error within the clearance system degrades the confidence of our ability to safeguard the safety of

---

service request that initiated the event was issued on December 20, 2010.  (Doc. 60-20 at 112; Melvin Depo. at 226.)  Finally, the QAO Report states:  "It was stated in the QHEAT that the Primary Authorized Employee's understanding of his role in verifying the adequacy of the clearance did not meet expectations for safe job procedures."  (Doc. 61-3 at 45.)  This language is echoed in PER 300866:  "The evaluation was conducted because of an inadequate clearance boundary. . . . CC-1:  The PAE [primary authorized employee] assumed the clearance was adequate."  (Doc. 60-33 at 20.)

[5] One of a series of identical write-ups lists "William J. Baker" as the responsible employee.  (Doc. 60-33 at 19.)  On this PER, Michelle Nunley is listed as the Supervisor and as the Department Manager.  (*Id*. at 21.)  However, another in the series lists Patrick Derriso as the "Responsible Employee."  (*Id*. at 2-3.)  In that write-up, Timothy Boland is listed as the Supervisor and "William J. Baker" is listed as the "Department Manager."  (*See id*.)  The court assumes that "William J. Baker" is Byron Baker, pursuant to Collins's testimony that the individual identified as working on the Alpha Battery Bank Charger was Byron Baker.  (Collins Depo. II at 95.)

the workers." (*Id*. at 21.)  The PER was rated level B.  (*Id*. at 20.)  Baker is still employed

with DZ.  (Collins Depo. II at 95.)

### III.  ANALYSIS

Plaintiff claims defendant terminated him in violation of the Age Discrimination in

Employment Act [ADEA], which prohibits certain employers from discriminating against

employees "because of [their] age." 29 U.S.C. § 623(a)(1).  In the absence of direct evidence

of discrimination, *see, e.g., Earley v. Champion International Corp.*, 907 F.2d 1077, 1081

(11th Cir. 1990) ("Fire Earley—he is too old"), these cases are typically analyzed using the

*McDonnell Douglas* burden-shifting method, *Chapman v. AI Transport*, 229 F.3d 1012, 1024

(11th Cir. 2000).  Under *McDonnell Douglas*, a plaintiff must establish a prima facie case

of age discrimination, which shifts the burden to the defendant to put forth a legitimate, non-

discriminatory reason for the adverse action.  *Id.*  If the defendant does so, the burden shifts

back to the plaintiff to show that the reason is pretext.  *Id.*

Defendant points to *Stanfield v. Answering Service, Inc.*, 867 F.2d 1290 (11th Cir.

1989), which states that a plaintiff can show a prima facie case by proving that "(1) plaintiff

was a member of a protected group, (2) plaintiff was discharged, (3) plaintiff was ***replaced***

with a person outside the protected group,[6] and (4) plaintiff was qualified to do the job." *Id.*

---

[6]"Outside the protected group," language drawn from *McDonnell Douglas*, is dated in light of *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996). As will be explained, what matters is how much younger the replacement was, not whether the replacement was in the protected class (individuals over 40).

at 1293 (emphasis and footnote added).  Defendant argues that plaintiff cannot prove he was

replaced by someone outside his protected class:

> First, no one was hired to replace Plaintiff.  The project for which Plaintiff was
> hired was near its end, having concluded on October 29, 2010, and other
> employees were used to assume parts of Plaintiff's job duties for a short period
> of time.  Second, no single person assumed Plaintiff's duties.  Instead,
> Plaintiff's duties were spread among several employees. . . . All [but one of
> them were] in the protected category of age.

(Doc. 54 at 26 [internal citations omitted].)  However, contrary to defendant's assumption,

a plaintiff alleging discriminatory termination based on an alleged work rule violation does

not have to prove he was replaced; he can establish a prima facie case by establishing that

defendant treated similarly situated, substantially younger employees more favorably with

regard to discipline for a work rule violation.  *See, e.g.*, *Jones v. Gerwens*, 874 F.2d 1534,

1540 and n.9 (11th Cir. 1989)(citing, *inter alia*, *Nix v. WLCY Radio/Rahall Communications*,

738 F.2d 1181, 1185 (11th Cir. 1984)("a plaintiff fired for misconduct makes out a prima

facie case of discriminatory discharge if he shows that he was qualified for the job from

which he was fired, and 'that the misconduct for which [he] was discharged was nearly

identical to that engaged in by [an employee outside the protected class] whom [the

employer] retained")).  When a plaintiff presents evidence that defendant treated the

comparator more favorably, "[t]he prima facie case is established even if the plaintiff's

replacement is also a member of the protected class."   *Nix*, 738 F.2d at 1185 (citing

*Cockrham v. South Central Bell Telephone Co.*, 695 F.2d 143, 145 (5th Cir. 1983)(per

15

curiam); *EEOC v. Brown & Root, Inc.*, 688 F.2d 338, 340 (5th Cir. 1982); *Byrd v. Roadway Express, Inc.*, 687 F.2d 85, 86-87 (5th Cir. 1982)).

Plaintiff argues that he can establish a prima facie case of age discrimination with reference to a younger employee, Byron Baker,[7] who committed a nearly-identical work rule violation, but was not discharged. (Doc. 59 at 42-44.) Defendant did not address any comparators arguably treated more favorably than plaintiff for nearly identical conduct in its Motion for Summary Judgment, focusing on plaintiff's replacements, and its Reply Brief is limited to its response to plaintiff's undisputed facts. Therefore, for purposes of deciding defendant's Motion for Summary Judgment, the court finds that plaintiff has established a prima facie case of age discrimination based on defendant's favorable treatment of Baker as compared to plaintiff.

Defendant alleges that it terminated plaintiff based on the procedure violation described in the QHEAT, which Melvin ascribed to plaintiff. (Doc. 54 at 27-29.) This is sufficient to carry defendant's "exceedingly light" burden to provide a legitimate, non-

---

[7]Collins testified that Baker was between 40 and 50 years old. (Doc. 55-6 at 95.) For purposes of age discrimination claims, comparators are not required to be outside the protected class; to be relevant comparators, they must be "substantially younger" than the plaintiff. *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996)(holding that whether replacement is "substantially younger than the plaintiff" is the true test); *Carter v. DecisionOne Corp*, 122 F.3d 997, 1003 (11th Cir. 1997) (holding that three years younger can be "substantially younger"). Plaintiff Cox was 62 at the time he was terminated. Therefore, Baker was at least 12 years younger than Cox. The court finds that Baker was substantially younger than Cox.

discriminatory reason for termination.  *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061

(11th Cir. 1994).

With regard to showing pretext under *McDonnell Douglas*, the Eleventh Circuit has

recently held:

> Once the employer identifies a legitimate, nondiscriminatory reason for
> its decision, the presumption of discrimination disappears, and the burden
> shifts back to the plaintiff "to demonstrate that the proffered reason was not
> the true reason for the employment decision." [*Dep't of Cmty. Affairs v.
> Burdine*, 450 U.S. 248,] 256 [(1981)].  The plaintiff "cannot recast the reason
> but must meet it head on and rebut it."  *Wilson* [*v. B/E Aerospace, Inc.*], 376
> F.3d [1079,] 1088 [(11th Cir. 2004)].  The plaintiff must show "weaknesses,
> implausibilities, inconsistencies, incoherencies, or contradictions" in the
> employer's rationale.  *Combs* [*v. Plantation Patterns*], 106 F.3d [1519,] 1538
> [(11th Cir. 1997)] (quotation marks omitted).  To do so, the plaintiff may rely
> on the evidence offered initially to establish the prima facie case.  *Wilson*, 376
> F.3d at 1088.

*Holland v. Gee*, 677 F.3d 1047, 1055-56 (11th Cir. 2012)

Defendant contends that to show that its proffered reason is pretext plaintiff must

establish that he "did not violate the cited work rule; or . . . [that] other employees outside

the protected class who committed similar violations were not similarly treated."  (Doc. 54

at 29-30 [citing *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 (11th

Cir. 1999)].)  Defendant argues that since Melvin had a "non-pretextual belief that [p]laintiff

overrode the quality control check points causing a major valve failure and resulting in a

three day shutdown of Unit 3 and a site clock reset," plaintiff cannot demonstrate pretext.

(*Id*. at 30.)   Defendant does not address whether other similarly-situated, substantially younger employees were treated more favorably.

Melvin testified that his decision to terminate Cox was based on two considerations: First, as a contractor, DZ is responsible to TVA.  When a power unit must be shut down and the site clock reset on DZ's watch, DZ's contract and reputation with its client TVA is at stake, and DZ must explain what happened.  (*See, e.g., id.* at 247-48.)  So, according to Melvin, every misstep by a DZ employee must be scrutinized closely.  And, second, TVA believed Cox had violated TVA procedure that resulted in a major negative event at the plant. Melvin testified that TVA's "[p]rocedures and work packages govern what [DZ does] at a nuclear power station."  (*Id.* at 217.)  He also testified that in the case of a procedure human performance event, the station, the employees, and the local public are at risk.  (*Id*.)  He testified, "You cannot NA a QC hold point.  [Cox's] integrity [was] in question [because he took] it upon himself without the QA or QC department validating [whether he could or could not] perform a step in a procedure."  (*Id.* at 234.)  Melvin stated, "It is expected that you perform the procedures as written.  It's also part of the safety of a nuclear power plant that if your work can't be performed as written, that's where you stop."  (*Id.* at 236-37.) Defendant contends, regardless of whether Cox's marking "N/A" on the data sheet caused any actual damage to TVA, his conduct was enough for Melvin to decide he had violated TVA procedure at a crucial point – a "QC hold point."

Plaintiff's contention that he did not cause the outage is irrelevant to the court's decision on defendant's Motion for Summary Judgment. (*See* doc. 59 at 46-49.) However, defendant has not addressed whether plaintiff can establish pretext based on defendant's more favorable treatment of similarly-situated, substantially-younger employees.[8]

To establish that a similarly-situated, substantially-younger employee was treated more favorably, plaintiff must prove similarity between his conduct and that of the comparator "in all relevant respects." *Wilson*, 376 F.3d at 1091. This includes showing that "that the quantity and quality of the comparator's misconduct [was] nearly identical" to his own conduct preceding his termination. *Burke-Fowler v. Orange Cnty*, 447 F.3d 1319, 1323 (11th Cir. 2006)(quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999))(internal quotation marks omitted); *see also Rioux v. City of Atlanta*, 520 F.3d 1269, 1279-80 (11th Cir. 2008)(applying "nearly identical" standard in pretext stage); *McCann v. Tillman*, 526 F.3d 1370, 1374 n.4 (11th Cir. 2008), *cert. denied sub nom. McCann v. Cochran*, 555 U.S.

---

[8]Plaintiff also alleges that defendant's Motion for Summary Judgment is due to be denied based on Melvin's inadequate investigation of his conduct before deciding to terminate him. (Doc. 59 at 46.) Plaintiff contends that his alleged procedural violation occurred before Melvin was employed at Browns Ferry and, therefore, Melvin had relied solely on his inadequate investigation. (*Id*.) He contends Melvin's investigation could not have provided a good-faith basis for his decision to fire Cox because Melvin never talked to Campbell, the supervisor allegedly responsible for the valve replacement project, during his investigation. (*Id*. at 49.) However, Melvin did not need to interview Campbell to determine whether Cox had written "N/A" because his initials – "JDC" – were written by each "N/A" strikethrough on the work package. (*See* doc. 60-29 at 3-8; Melvin Depo. at 232.) Therefore, Melvin did not lack a good-faith basis for concluding that Cox had violated procedure simply because he failed to interview Campbell.

944 (2008).  The "nearly identical" standard means that the court will only compare apples to apples.  *Maniccia*, 171 F.3d at 1368-69.  The Eleventh Circuit has repeatedly emphasized that the district court is not tasked with reviewing an employer's business judgment.  In *Elrod v. Sears, Roebuck*, the court held:

> The inquiry of the ADEA is limited to whether [decisionmakers] and believed that [plaintiff] was guilty of [a work-rule violation], and if so, whether this belief was the reason behind [plaintiff's] discharge.  Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere.  Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.  For an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory.

*Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).  By considering only incidents of nearly-identical misconduct, the court properly limits its consideration to incidents of apparently disparate treatment.  *See Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2000); *see also Wilson*, 376 F.3d at 1091-92.

Plaintiff puts forward three comparators:  Baker, (doc. 59 at 42-44), Collins, (*id*. at 44-45), and Campbell, (*id*. at 48-49, 31 ¶ 50).  Collins's and Campbell's conduct is readily distinguishable from Cox's.  According to Cox, Collins committed a "serious safety violation[]" when workers he supervised allowed a metal shear to dislodge and fall.  (*Id*. at 44.)  Plaintiff does not present any other details about the incident – such as whether the site clock was reset or whether a QHEAT found that Collins had violated procedure.  Therefore,

Cox has not shown that Collins was engaged in nearly identical conduct but was treated more favorably.

Plaintiff seems to imply that Campbell, the supervisor under Cox, was to blame for the outage, since he actually handled the installation of the failed valve, but was not disciplined. (*Id*. at 48-49, 31 ¶ 50.)  However, as Melvin testified, Campbell could not act without Cox's approval, and it was Cox's authorization that caused the bypass of the QC hold point.  (Melvin Depo. at 220-21, 224-25, 237-38.)  This is certainly a reasonable distinction and it establishes that Campbell and Cox were not similarly situated in all relevant aspects with regard to the problems with the Unit 3 reactor vent.

At set forth above, Baker is substantially younger than Cox.  Also, Baker's conduct came under scrutiny after his  performance on a project allegedly resulted in a site clock reset. His misconduct shares many common attributes with Cox's alleged misconduct. (*See* doc. 59 at 42-44.) DZ has not presented any argument to distinguish Cox's misconduct from Baker's misconduct.  Had defendant offered some reasoned argument for finding the violations at issue were not nearly identical, a more considered comparison may have been possible.  (*See* doc. 54 [not addressing comparator evidence in summary judgment brief]; doc. 63 [no response to plaintiff's arguments, only his facts].)  As it is, no significant differences are apparent.[9]  The events both resulted in a site clock reset.   Both Baker and

---

[9]This case turns on analysis of an extremely technical subject—nuclear engineering procedure, yet defendant let plaintiff argue his comparator evidence unopposed. Perhaps

Cox violated established procedures.  The work could not or should not have been performed as written and the employees should have stopped, but they moved forward.  The PER level for both events was "B," signifying that TVA considered the violations equal or comparable, at least on some level.

Although the court notes that a power unit had to be taken offline as a result of the violation in Cox's case, this difference alone does not prevent the conduct of Cox and Baker from being deemed nearly identical for purposes of deciding the Motion for Summary Judgment.  Therefore, plaintiff has shown that Melvin treated a significantly younger, similarly-situated employee more favorably than he treated plaintiff.  This difference in treatment would support a reasonable jury verdict that DZ's articulated reason for terminating Cox is unworthy of credence.

Moreover, the court finds that a reasonable jury could find Melvin's comments regarding "old" employees of TVA reflected age-based animus.  While Melvin's comments are not direct evidence that he terminated Cox because of his age, the evidence of Melvin's

─────────────────────

defendant did not anticipate plaintiff using Baker as a comparator, or relied on the fact that it is plaintiff's burden to show pretext. The court will not pretend to have considered every possible relevant difference between the alleged misconduct of Cox and Baker.  Perhaps Melvin can point out he considered Baker's procedural violation to be different than Cox's, though on the evidence before the court, the two seem nearly identical.  If he can, he will have to do so at trial. "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments . . . ." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (internal citations omitted).

comments to Cox and Watson and his termination of both men, together with evidence that a substantially-younger individual was not terminated, is sufficient circumstantial evidence to support a jury verdict in favor of Cox.[10]   *Wilson*, 376 F.3d at 1091 ("Language not amounting to direct evidence, but showing some [discriminatory] animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case.") (internal quotation marks and citations omitted).

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are material facts in dispute and defendant is not entitled to judgment as a matter of law.  An Order denying defendant's Motion for Summary Judgment, (doc. 53), will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 31st day of March, 2014.

*Sharon Lovelace Blackburn*

SHARON LOVELACE BLACKBURN
UNITED STATES DISTRICT JUDGE

------------------------

[10]The court notes that the evidence is not such that a reasonable jury would be compelled to find in favor of Cox.  Certainly, the jury does not have to view the evidence in the light most favorable to Cox and presumably will have defendant's explanation of the reasons, if any, for treating Baker more favorably than Cox.  The jury may also find that when Melvin referred to "old station personnel" he was not referring to the age of the employees, but the length of time they had worked for the company.  However, the court, viewing the evidence in the light most favorable to Cox, the non-movant, and drawing all reasonable inferences in his favor, finds the evidence is sufficient to support a jury verdict in favor of Cox and against DZ on Cox's termination claim.